UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JIAN-JIAN REN

      Plaintiff,

vs.

CASE: 6:04-CV-257-ORL-18JGG

BOARD OF GOVERNORS and
UNIVERSITY OF CENTRAL FLORIDA,

      Defendants.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, JIAN-JIAN REN ("REN"), by and through her undersigned counsel, hereby sues Defendants, BOARD OF GOVERNORS ("BOARD") and UNIVERSITY OF CENTRAL FLORIDA ("UCF"), and states as follows:

### JURISDICTION AND VENUE

1. This is an action for damages in excess of the jurisdictional minimum of this Court, for violations of Title VII of the Civil Rights Act of 1964, as amended, the Florida Civil Rights Act of 1992, and the Florida Educational Equity Act. This Court has subject matter jurisdiction pursuant to 42 U.S.C. §2000e, *et seq.*; Chapter 760 of the Florida Statutes; Chapter 1000 of the Florida Statutes; and, 28 U.S.C. §§1331, 1343 and 1367. Venue is proper in this Court under 28 U.S.C. §1391(b) and Rule 1.02(c), Local Rules of the United States District Court for the Middle District of Florida.

G:\WP\00500086\PLE_COMP.02

## PARTIES AND FACTUAL ALLEGATIONS

2.     Plaintiff, JIAN-JIAN REN ("REN"), was a resident of Orlando, Orange County, Florida, at all times relevant to this action.

3.     Plaintiff, REN, is a female born on December 2, 1960.

4.     Defendant, BOARD OF GOVERNORS ("BOARD"), is the governing body for Florida public universities and was created to co-ordinate the State University System pursuant to the passage of Constitutional Amendment 11.

5.     Defendant, UNIVERSITY OF CENTRAL FLORIDA ("UCF"), is a Florida public university pursuant to the "Florida K-20 Education Code" under the authority of the State Board of Education, and is an employer within the meaning of 42 U.S.C. §2000e(b) and F.S. §§760.02(7). UCF is situated in Orlando, Orange County, Florida.

6.     On or about August 2001, REN became employed by UCF as an Associate Professor with tenure in the Department of Mathematics.

7.     REN received her PH. D. from the University of North Carolina in 1990. Prior to joining the faculty at UCF, REN was an Assistant Professor at the University of Nebraska from 1990-1996 (promoted to Associate Professor with tenure in Spring of 1996), and an Associate Professor at Tulane University from 1996-2001 (with full tenure status in Spring of 1997.) In addition to teaching, REN has received many honors and awards in her discipline, as well as over $411,000 in research and travel grants mainly from federal agencies, including the National Science Foundations, Department of Defense, and Department of Energy. She has been invited to give lectures at national and international

conferences; participated in numerous statistical seminars and other research activities; was a panelist for the Statistics and Probability Program at the National Science Foundation in December 2002; is a referee for 12 international journals in statistics and probability; and is a reviewer for *Mathematics Review* of The American Mathematical Society (AMS). Since 1990, REN has published twenty-four (24) papers, twenty-two (22) in statistics and probability and two (2) in biomedical research. Ten (10) of these papers were authored by REN alone, and three (3) have appeared in *The Annuals of Statistics*, which is the most prestigious international journal in statistics.

8.  In August of 2002, Dr. M. Zuhair Nashed became chair of the Department of Mathematics at UCF. Since his appointment, REN has been subjected to disparate treatment based upon her gender. Dr. Nashed did not treat REN with the same respect that he extended to her male colleagues. For example, at a faculty meeting in September 2002, REN was constantly interrupted by Dr. Nashed when she attempted to express her opinion; however, her male colleagues were treated with respect when they spoke up. After REN finally protested this treatment, Dr. Nashed's anger was evident to all.

9.  Dr. Piotr Mikusinski was the Department Chair prior to Dr. Nashed. Prior to his departure, Dr. Mikusinski indicated to REN in writing that he intended to support her promotion to professor.

10.  In October 2002, Dr. Nashed's prejudice against women mathematicians was evident in his evaluation for REN's application for promotion to professor. Four outside reviewers, who were experts in Plaintiff's field of research and were eminent scholars, wrote

excellent letters on REN's behalf for promotion, and the Department Promotion and Tenure Committee voted unanimously to support REN's promotion. Dr. Nashed told REN the outside reviewers were not candid when writing letters about her work, although he chose to believe whatever was said (both positive and negative) by the outside reviewers for the two male applicants. He also said that the Department Promotion and Tenure Committee members were "good old men" and did not review her case carefully; although he considered the Committee did its job carefully with the two male applicants. However, Dr. Nashed, believing that a woman cannot obtain national recognition for her work on her own, and, disregarding the evaluations of four prominent scholars in REN's field, concluded in his evaluation for REN's promotion that her strongest papers all had senior stars as co-authors. Dr. Nashed has no expertise in statistics and his evaluation was riddled with lies and twisted facts which ultimately led to REN's denial for promotion. Contrary to Dr. Nashed's evaluation, two of the "senior stars" were about the same age as REN and obtained their Ph.Ds only a few years prior to REN obtaining her PH.D. in 1990. In his review of REN's male colleagues, Dr. Nashed did not jump to this type of conclusion regarding their co-authors being "senior stars." Furthermore, Dr. Nashed intentionally did not include in his evaluation the fact that REN's single-authored paper was to appear in *The Annals of Statistics*, which he acknowledged as the premier journal in the field of statistics. Not believing that women mathematicians can do high quality work on their own, Dr. Nashed, in his evaluation for REN's promotion, recommended her to continue writing papers with "senior stars" in order to "considerably enhance her national recognitions."

11.     In addition, when Dr. Nashed became Chair, Plaintiff REN was in the middle of her pregnancy. After knowing REN for only one week, Dr. Nashed made a disparaging comment regarding women to the effect that "to women, family is more important." REN's evaluation took place when she was in her ninth month of pregnancy. In his recommendation in October of 2002, Dr. Nashed claimed that the intensity of REN's research had not been sustained in recent years. This comment was a direct reference to REN's pregnancy and was false. During the summer of 2002, Plaintiff received a new three year research award from The National Science Foundation (NSF), which contradicts Dr. Nashed's claim. Furthermore, in August 2002, after knowing REN for less than two weeks, Dr. Nashed said to REN that she got her grant because she <u>knew</u> someone at NSF. Upon information and belief, Dr. Nashed never made such comments about male colleagues in the department.

12.     Dr. Nashed's recommendation regarding REN's promotion to professor was not based on meritorious performance, but rather on his prejudice against women in mathematics. His false statements caused substantial harm to Plaintiff in the process of the review for her promotion. In addition, Dr. Nashed used a totally different approach to evaluate REN's male colleagues and regarded the opinions of their outside reviewers in his decisions, unlike his disregard for the opinions of Plaintiff's reviewers. Furthermore, Dr. Nashed did not follow UCF guidelines when he failed to notify REN of his intent not to support her promotion until the moment he gave REN her evaluation. However, Dr. Nashed did follow this policy with Dr. David Rollins who had an unfavorable outside review letter;

thus allowing Dr. Rollins the opportunity to withdraw his promotion application prior to his evaluation.

13. REN first raised the allegation of gender discrimination with Dean Seidel, in writing and in a personal meeting, on October 18, 2002. REN subsequently raised the allegation of gender discrimination with Dean Seidel in meetings and written communications in November and December of 2002, and again multiple times in the first few months of 2003. REN also filed a grievance alleging gender discrimination on or about November 14, 2002.

14. On or about October 18, 2002, REN responded to Dr. Nashed's negative evaluation, and had a meeting with Dean Seidel of the College of Arts and Sciences to discuss the false statements in Dr. Nashed's evaluation. On or about November 13, 2002, the College Promotion and Tenure Committee voted against REN's promotion, and REN responded to this committee's evaluation on or about November 16, 2002. REN met with Dean Seidel on or about November 18, 2002, to again point out the twisted facts in Dr. Nashed's evaluation; however, Dean Seidel relied on Dr. Nashed's evaluation and voted against REN's promotion.

15. On or about January 22, 2003, REN e-mailed Dr. Nashed a suggestion regarding the departmental representative for the TIP Award Selection Committee. Dr. Nashed considered this an "instruction" rather than a suggestion, and even mentioned it in a faculty memo. Dr. Nashed did not treat suggestions from male faculty as "instructions."

16. On or about January 24, 2003, the University Promotion and Tenure Committee voted 4 to 2 supporting REN's promotion. Despite this, on or about March 17, 2003, Provost Gary Whitehouse informed REN that her promotion was denied, but no specific reason was given. With the negative evaluation from Dr. Nashed, the College Promotion and Tenure Committee had voted against REN's promotion. The higher administrators conceded that they had concerns about whether Dr. Nashed could effectively function as a Chair if REN were promoted to professor, rather than concentrating on REN's scholarly accomplishments, which were sufficiently meritorious for promotion to professor.

17. REN was the first female faculty member to come up for promotion to professor in the history of the Department of Mathematics at UCF. In Plaintiff's department, there had never been a female full professor, and before 2000 there had never been a tenured woman professor on the faculty. Although REN's promotion was denied, Dr. Morgan C. Wang, a male associate professor in the Department of Statistics, was promoted to professor. Dr. Wang received his Ph.D. one year later than REN, and had less experience as a university professor. Dr. Wang worked in the same research field as REN, but had a weaker record of scholarly achievements. He had eighteen (18) refereed publications compared to REN's twenty-four (24), and had not received any research awards from any federal agencies, while REN had received three (3) since 1995. All these show that UCF did not apply the same standards to REN when evaluating scholarly achievements as they did to her male colleagues in the same year, and discriminated against REN based upon her gender.

18. During her employment with UCF, Plaintiff REN consistently met or exceeded the employment expectations of UCF.

19. On or about March 24, 2003, Plaintiff REN filed a charge of discrimination with the Florida Commission on Human Relations ("FCHR"), and the Equal Employment Opportunity Commission ("EEOC"). On or about February 11, 2004, Plaintiff REN received a Notice of Right to Sue from the EEOC.

20. Since filing charges against UCF, Plaintiff Ren has been retaliated against by Dr Nashed. In June 2003, REN discovered that Dr. Nashed had been telling lies about her to the Dean's office. For example, Dr. Nashed said that REN had been bad-mouthing UCF in front of students or job candidates and that REN had stopped speaking to Dr. Nashed after he disfavored her promotion. Dr. Nashed repeated this later statement in front of REN, Dean Seidel, and Associate Dean Fernandez during a meeting on August 21, 2003. During the meeting between REN and Provost Whitehouse (he stepped down from the Provost position in July 2003) regarding her promotion on February 19, 2003, Whitehouse asked REN whether she would be able to work with the Chair if she were promoted to professor, and at the end of the meeting he told REN that he would need to speak to Dean Seidel before making his final decision on her promotion. Noting that the final recommendation about REN's promotion before Provost's decision was from the University Promotion & Tenure Committee and it was positive, it is evident that the Provost's final negative decision was influenced by Dr. Nashed's lies about REN that he had told the Dean's Office.

21. In addition, after REN filed with EEOC and FCHR, Dr. Nashed gave her an unfair annual evaluation full of errors, misleading comments, and unfair ratings. REN tried to communicate with him about these errors for over a month, but Dr. Nashed refused to change the ratings and answer Plaintiff's questions. After REN submitted her comments on her Annual Evaluation by Dr. Nashed, he added additional comments and forwarded them to the Dean's Office without showing them to REN first, which is a direct violation of UCF policy regarding Faculty Annual Evaluations. REN finally discussed her annual evaluation with Dean Seidel, who confirmed that Dr. Nashed's additional comments about Plaintiff's evaluation should not be attached to the evaluation. Further, although votes and comments with regard to department candidates are supposed to be anonymous, after REN filed her gender discrimination complaints, Dr. Nashed began tracking her handwriting on her votes, and used that against her on her Annual Evaluation. Dr. Nashed told Dean Seidel that REN wrote unfair comments about some job candidates, voted for her husband, and moved the faculty to vote against one job candidates' tenure. Not only were these claims false, but Dr. Nashed's conduct was unethical and clearly a vengeful act. In academia, it is understood that the faculty have the right to express their opinion about the job candidates and to disagree with the Chair.

22. On or about August 21, 2003, there was a meeting with Dean Seidel, Associate Dean Fernandez, Dr. Nashed, and REN. During this meeting, REN presented comparisons between her and her colleagues' performance and evaluations. Dr. Nashed gave better ratings in Service and Overall Performance on Annual Evaluations to faculty with

substantially less work done than REN. He justified this by saying he could not list REN serving as a NSF panelist under Service based on the Departmental Guidelines. Dr. Nashed justified his evaluation of Plaintiff with more false statements. Under pressure from Dean Seidel, Dr. Nashed did agree to eliminate some harmful statements in his evaluation, but refused to change the ratings. During this meeting with Dean Seidel, REN commented that Dr. Nashed had given her an unfair Annual Evaluation despite the fact she received a NSF research award. Dr. Nashed retorted that he hoped she would keep her grant like one of the new faculty members who kept his for 25 years. Note that this faculty member did not need a 25 year research grant record to become Full Professor, and the male faculty members promoted to Professor in Fall 2001 and 2002 never received any research awards from any federal agency. On or about August 31, 2003, REN wrote to Dean Seidel with evidence refuting Dr. Nashed's false statements made during the meeting on August 21, 2003.

23. On August 27, 2003, REN had a meeting with Associate Dean Fernandez regarding her Annual Evaluation by Dr. Nashed. In this meeting, Dean Fernandez asked REN about the status of her complaints with FCHR and said that she should get her promotion by her record, not by a lawsuit. Associate Dean Fernandez e-mailed REN on September 23, 2003, telling her that they could not list serving as NSF panelist under Service because of the Departmental Guideline about Annual Evaluation. In Dr. Nashed's additional comments on REN's evaluation and during the meeting on August 21, 2003, he already agreed to list serving as NSF panelist under Service. Moreover, in his Memo to the faculty on June 13, 2003, at the time he gave the faculty Annual Evaluation, Dr. Nashed attached the

UCF Guideline for Annual Evaluation, which clearly listed this kind of activity as Service, and at different occasions he told the faculty that he followed UCF guideline to conduct the Annual Evaluation this year. After REN pointed out these facts to Associate Dean Fernandez, she was told during a meeting with Fernandez on October 15, 2003, that Dr. Nashed was still not willing to list NSF panelist under Service and was still refusing to change the rating of Service and Overall Performance of REN. This retaliatory action affects Plaintiff's salary, promotion, and any chance of UCF awards, because the Annual Evaluation is to be used in all these for years to come.

24. Plaintiff REN requested to serve on the Faculty Search Committee in the Spring of 2003 when the Department of Mathematics was hiring new faculty and one of the research fields advertised was Stochastic P.D.E., and again in the Spring of 2004 when one of the research fields advertised was Probability. REN has the expertise close to these research fields; however, Dr. Nashed refused to put REN on the Faculty Search Committee in both instances and instead placed individuals whose research fields were far from those being recruited. In REN's annual evaluation for 2002-2003, Dr. Nashed refused to rate her "Service" as "Outstanding" despite her many contributions. At the August 21, 2003 meeting with Dean Seidel and Associate Dean Fernandez, Dr. Nashed justified his rating by stating the REN did not serve on "heavy duty" committees such as the Faculty Search Committee.

25. In addition, REN had requested to teach a specific course in the 2003 Fall Term (primarily because of her 8-month old baby), which is traditionally a common practice in the department, but Dr. Nashed refused to accommodate REN regarding this teaching

assignment. During the August 21, 2003 meeting with Dean Seidel, Dr. Nashed agreed to change REN's teaching assignment, but refused to give her the course she had requested for more than 3 months. This course was ultimately given to a professor who had not even requested this particular assignment. In the Department of Mathematics at UCF, the faculty's wishes for teaching assignments are generally accommodated. This retaliatory action affected Plaintiff's salary, promotion, and eligibility for awards.

26. Plaintiff has exhausted all her administrative remedies, and has met or waived all conditions precedent to this action.

27. Plaintiff has retained the undersigned counsel to prosecute this action and has agreed to pay them a reasonable fee for their services.

### COUNT I - TITLE VII - GENDER DISCRIMINATION

28. This is an action for damages and other appropriate relief for violation of Title VII of the Civil Rights Act of 1964, as amended, specifically 42 U.S.C. §2000e, *et seq.*

29. Plaintiff repeats and incorporates by reference herein Paragraphs 1 through 27 above, as though fully set forth herein.

30. Defendant UCF has intentionally discriminated against Plaintiff because of her gender, including but not limited to discriminatory failure to promote Plaintiff.

31. All conditions precedent to this action have been met or waived.

32. As a result of the intentionally discriminatory actions by UCF, Plaintiff has sustained significant damages in the form of pain, suffering and mental anguish and will continue to sustain said damages in the future.

33. Plaintiff has also sustained damages in the form of lost wages and benefits.

34. Plaintiff has retained the undersigned counsel to prosecute this action and has agreed to pay them a reasonable fee for their services.

WHEREFORE, Plaintiff demands judgment against the BOARD and UCF for back pay and benefits, front pay, and for compensatory and punitive damages as provided by 42 U.S.C. §2000e, including costs, interest and attorneys' fees, and all other remedies deemed appropriate by this Court.

## COUNT II - TITLE VII - RETALIATION

35. This is an action for damages and other appropriate relief for violation of Title VII of the Civil Rights Act, specifically 42 U.S.C. §2000(e)-3.

36. Plaintiff repeats and incorporates by reference herein Paragraphs 1 through 27 above, as though fully set forth herein.

37. Plaintiff has been intentionally retaliated against because of her opposition to UCF's unlawful employment practices, as set forth in the preceding paragraphs, in violation of 42 U.S.C. §2000e-3.

38. UCF has intentionally retaliated against and continues to retaliate against Plaintiff because of her opposition to UCF's unlawful employment practices, including but not limited to its discriminatory failure to promote Plaintiff.

39. All conditions precedent to this action have been met or waived.

40. As a result of the intentionally retaliatory actions of UCF, Plaintiff has sustained significant damages in the form of pain, suffering and mental anguish and will continue to sustain said damages in the future.

41. Plaintiff has also sustained damages in the form of lost wages and benefits.

42. Plaintiff has retained the undersigned counsel to prosecute this action and has agreed to pay them a reasonable fee for their services.

WHEREFORE, Plaintiff demands judgment against the BOARD and UCF for back pay and benefits, front pay, and for compensatory and punitive damages as provided by 42 U.S.C. §2000e-5, including costs, interest and attorneys' fees, and all other remedies deemed appropriate by this Court.

## COUNT III - FLORIDA CIVIL RIGHTS ACT - GENDER AND RETALIATION

43. This is an action for damages and other appropriate relief for violations of the Florida Civil Rights Act of 1992 as set forth in Chapter 760 of the Florida Statutes.

44. Plaintiff repeats and incorporates by reference herein Paragraphs 1 through 27 above, as though fully set forth herein.

45. UCF intentionally discriminated against Plaintiff on the basis of her gender, and has intentionally retaliated against and continues to retaliate against Plaintiff for her opposition to UCF's unlawful employment practices, as set forth in the preceding paragraphs, in violation of § 760.10 of the Florida Statutes.

46. Plaintiff has exhausted all administrative remedies set forth in Chapter 760 of the Florida Statutes, and has met or waived all conditions precedent to this action.

47. As a result of the intentionally discriminatory and intentionally retaliatory actions of UCF, Plaintiff has sustained significant damages in the form of pain, suffering, and mental anguish and will continue to sustain said damages in the future. Plaintiff has also sustained damages in the form of lost wages and benefits.

48. Plaintiff has retained the undersigned counsel to prosecute this action and has agreed to pay them a reasonable fee for their services.

WHEREFORE, Plaintiff REN demands judgment against Defendants the BOARD and UCF for back pay and benefits, front pay and judgment for compensatory and punitive damages as provided by Chapter 760 of the Florida Statutes, including costs, interest and attorneys' fees, and all other remedies deemed appropriate by this Court.

### COUNT IV - FLORIDA EDUCATIONAL EQUITY ACT
### GENDER DISCRIMINATION

49. This is an action for damages and other appropriate relief for violations of the Florida Educational Equity Act as set forth in Chapter 1000 of the Florida Statutes.

50. Plaintiff repeats and incorporates by reference herein Paragraphs 1 through 27 above, as though fully set forth herein.

51. UCF intentionally discriminated against Plaintiff on the basis of her gender, as set forth in the preceding paragraphs, in violation of § 1000.05(2)(a) of the Florida Statutes.

52. Plaintiff has exhausted all administrative remedies set forth in Chapter 1000 of the Florida Statutes, and has met or waived all conditions precedent to this action.

53.    As a result of the intentionally discriminatory actions of UCF, Plaintiff has sustained significant damages in the form of pain, suffering, and mental anguish and will continue to sustain said damages in the future. Plaintiff has also sustained damages in the form of lost wages and benefits.

54.    Plaintiff has retained the undersigned counsel to prosecute this action and has agreed to pay them a reasonable fee for their services.

WHEREFORE, Plaintiff REN demands judgment against Defendants the BOARD and UCF for all remedies as provided by Chapter 1000 of the Florida Statutes, including costs and attorneys' fees, and all other remedies deemed appropriate by this Court.

### DEMAND FOR JURY TRIAL.

55.    Plaintiff hereby demands a trial by jury on all issues so triable.

DATED this 26th day of February, 2004.

DeCUBELLIS & MEEKS, P.A.

By: _____
Mary B. Meeks
Florida Bar No. 769533

837 North Garland Avenue
Post Office Box 4976
Orlando, Florida 32802-4976
Telephone: (407) 872-2200
Telecopier: (407) 423-1038

Attorneys for Plaintiff