IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JIAN-JIAN REN,

    Plaintiff,

vs.                                           CASE NO.: 6:04-cv-257-Orl-18KRS

UNIVERSITY OF CENTRAL FLORIDA
BOARD OF TRUSTEES,

    Defendant.
_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant University of Central Florida Board of Trustees' ("UCF" or "Defendant") motion for summary judgment (Doc. 21, filed April 4, 2005), to which Plaintiff Jian-Jian Ren ("Ren" or "Plaintiff") responded in opposition (Doc. 29, filed April 25, 2005). Ren brings this case against her employer under Title VII, the Florida Civil Rights Act, and the Florida Educational Equity Act for UCF's alleged failure to promote on the basis of gender discrimination and retaliation. The Court grants UCF's motion for summary judgment.

### I. BACKGROUND

UCF hired Ren, a female, as an Associate Professor of Mathematics with tenure in August, 2001. Approximately one year later, on September 1, 2002, Ren formally applied for a promotion to Full Professor. (Pl.'s Ex. A1 at 7.) The promotional policy at UCF allows tenured faculty members to apply for Full Professor as many times as they wish; a denial does not effect their employment at the institution and the candidate may apply again in the following year. The promotional process is a seven tier system. Each tier is composed of either a committee or a figure of authority, such as a dean, provost, or president. Tiers one through

five review the candidate's file and provide formal recommendations. Tier six, held by the Provost, considers the file, reviews the recommendations, conducts a one-half hour interview with the candidate, and prepares a tentative decision. At tier seven, the Provost consults with the University President, who weighs heavily on the Provost's decision and typically does not overturn it. (Hitt Dep. at 54.) Ren's application for Full Professor went through the promotional process in the following way:

(1) The Mathematics Department Promotion and Tenure Committee ("MDPTC"), a four member committee chaired by Gary Richardson ("Richardson"), voted unanimously in favor of promotion.

(2) The Chair of the Department of Mathematics, Zuhair Nashed ("Nashed"), voted against promotion. In his evaluation, Nashed noted that the intensity of Ren's research following the achievement of her Ph.D. had not been sustained during the most recent four years. Nashed also stated that "the time has been too short to expect that her publications record would be really different from her record when she was appointed at UCF." (Def.'s Ex. N at 2.)

(3) The College of Arts and Sciences Promotion and Tenure Committee ("CASPTC"), a seventeen member committee, chaired by Richard Greenwood ("Greenwood"), voted six in favor and eleven against Plaintiff's promotion.

(4) The Dean of the College of Arts and Sciences, Katherine Seidel ("Dean Seidel"), voted against Plaintiff's promotion. Dean Seidel, a female, explained in her evaluation that Ren's student evaluation summaries of her three courses "generally are not in the excellent category." (Def.'s Ex. Q.) With respect to research, Dean Seidel stated: "Evidence of an established national reputation might be strengthened with a citation search or other indications that her work is already known and influential. While her scholarly trajectory augurs well for the

2

future, it does not support promotion to Professor at this time." (Id.)

(5) The University Promotion and Tenure Committee ("UPTC"), a six member committee chaired by Richard Tucker ("Tucker"), voted four in favor and two against promotion.

(6) The Provost and Vice President of Academic Affairs, Gary Whitehouse ("Provost Whitehouse"), made the tentative decision to deny Ren's promotion. The six reasons underlying his decision are discussed in the pretext analysis of this decision. Part II(B)(2), *infra*.

(7) The President of UCF, John Hitt ("President Hitt"), approved the Provost's decision to deny Ren's promotion.

In summary, the MDPTC and the UPTC voted in favor of Ren's promotion while Nashed, the CASPTC, and Dean Seidel voted against promotion. Provost Whitehouse and President Hitt denied Ren's promotion on March 17, 2003.

Ren alleges that Nashed, the Chair of Mathematics, subjected her to gender-based disparate treatment. (Compl. at ¶ 8.) Ren does not allege an illegal discriminatory motive by others involved in the promotion process, but alleges that Nashed unlawfully influenced and tainted the subsequent tiers of the process thereby imputing his discriminatory intent, ultimately, to Provost Whitehouse. (Doc. 29 at 5.) With respect to Nashed, Ren alleges the following circumstantial evidence of discriminatory animus:

(1) At a meeting, Nashed repeatedly interrupted Ren when she attempted to express her opinion while male colleagues were treated with respect. (Zhao Aff. at 3; Compl. at ¶ 8; Doc. 29 at 17.)

(2) During a dinner conversation, Ren mentioned that earlier in the day she had been feeling "pretty bad" and "nauseous" due to her pregnancy. Because of her condition, she stated that she had not been able to get her work done as efficiently as usual, to which Nashed remarked: "to women, family is more important." (Ren Dep. at 380; Zhao Aff. at ¶ 6; Compl. at ¶ 11; Doc. 29

at 17.)

(3) Nashed sent an email only to the female professors in the mathematics department suggesting that they seek travel grants from AMS, despite the fact that each female professor had a research grant that made them ineligible for the travel grants. (Ren Dep. at 301-02; Doc 29 at 17.)

(4) Nashed stated to Ren that she received her NSF research grant because she knew someone at NSF. (Doc. 29 at 17; Ren Dep. at 302.)

(5) In his three academic years at UCF, Nashed voted in favor of each of the three male candidates under consideration for promotion to Full Professor, although Nashed made a verbal negative recommendation to a male candidate who sought his opinion before formally applying. (Pl.'s Ex. 20; Doc. 29 at 17.)

(6) Nashed did not vote in favor of Ren's promotion despite the fact that the prior Chair, Piotr Mikusinski, had indicated, before departing, that he intended to support her. (Compl. at ¶ 9.)

(7) Nashed did not vote in favor of promotion despite the positive reviews from four outside reviewers and the MDPTC approval of her promotion. (Compl. at ¶ 10; Zhao at ¶ 5.)

(8) Another female associate professor of mathematics, Cynthia Young, complained to Dean Seidel that she was the subject of Nashed's gender discriminatory actions. Younger complained that Nashed did not support some of her projects and grants, to which Dean Seidel explained to Younger that male faculty members had expressed the same complaint about Nashed's failure to support their projects. (Seidel Dep. at 91-92.) Dean Seidel counseled Younger to provide Nashed with more information, which—according to Dean Seidel—caused

Nashed to be more supportive of Younger. (Id. at 95-96.)[1]

(9) A male associate professor of mathematics, Yue Zhao, refers to incidents (1), (2), and (7), and states that he has "seen and heard many things reflecting Dr. Nashed's discriminatory treatment toward female colleagues in my department, specifically including [Ren]." (Zhao Aff., at ¶¶ 3, 4.)

## II. DISCUSSION

### A. Summary Judgment Standard

A court will grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see e.g., Stachel v. City of Cape Canaveral, 51 F. Supp. 2d 1326, 1329 (M.D. Fla. 1999). Material facts are those that may affect the outcome of the case under the applicable substantive law. Disputed issues of material fact preclude the entry of summary judgment, but factual disputes that are irrelevant or unnecessary do not. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of proving that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 324-25 (1986). In determining whether the moving party has satisfied its burden, the Court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion and resolves all

---

[1] Although Ren also asserts that Marianna Pensky complained of gender bias, the Record does not support it. Pensky's complaint regarding her lower-than-expected evaluation did not allege gender bias. (Seidel Dep. at 98.) Dean Seidel does state, on the other hand, that she was approached by Pensky's husband who told her that Nashed's actions "might have to do with discrimination." (Seidel Dep. at 118.) It is also noteworthy that Pensky's complained of incident occurred after Ren's promotion evaluation, the subject of this case. (Seidel Dep. at 98.)

reasonable doubts against the moving party. Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). The moving party may rely solely on his pleadings to satisfy its burden. Celotex, 477 U.S. at 323-24. A non-moving party bearing the burden of proof, however, must go beyond the pleadings and submit affidavits, depositions, answers to interrogatories, or admissions that designate specific facts indicating there is a genuine issue for trial. Id. at 324. If the evidence offered by the non-moving party is merely colorable, or is not significantly probative, the Court may grant summary judgment. Anderson, 477 U.S. at 249-50. Similarly, summary judgment is mandated against a party who fails to prove an essential element of its case. Celotex, 477 U.S. at 322.

### B. Gender Discrimination

Title VII and the Florida Civil Rights Act ("FCRA") make it unlawful for employers to intentionally discriminate "with respect to compensation, terms, conditions, or privileges of employment" based upon protected traits including race, color, religion, and sex. 42 U.S.C. § 2000e-2(a)(1); Fla. Stat. ch. 760.10(1)(a)(2003). A plaintiff may prove intentional discrimination using direct, circumstantial, or statistical evidence. See Standard v. ABEL Serv., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).[2] In this case, where Ren seeks to prove intentional discrimination using circumstantial evidence, the Court applies the familiar three-part, burden-shifting analysis promulgated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Tex. Dept. of Comm. Affairs v. Burdine, 450 U.S. 248

---

[2] Federal case law interpreting Title VII is applicable to discrimination cases arising under the FCRA. "Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII." Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387, 1389-90 (11th Cir. 1998); see also Fla. State Univ. v. Sondel, 685 So.2d 923 (Fla. 1st DCA 1996).

(1981). Under this framework, the plaintiff has the initial burden of establishing a prima facie case by a preponderance of the evidence. Burdine, 450 U.S. at 252-53. If the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason for the employee's rejection." Id. at 253 (citation and internal quotation omitted). If the defendant offers a legitimate, nondiscriminatory reason, the plaintiff can avoid summary judgment only by producing "sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." Chapman v. AI Transport, 229 F.3d 1012, 1037 (11th Cir. 2000) (citing Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997) (requiring a plaintiff to rebut "all of the defendant's proffered nondiscriminatory reasons for its actions" to avoid judgment as a matter of law)).

### 1. Ren Fails to Bring a Prima Facie Case

To establish a prima facie case of gender discrimination in a promotional decision, "a plaintiff must prove: (1) that she is a member of a protected minority; (2) that she was qualified and applied for the promotion; (3) that she was rejected despite these qualifications; and (4) other equally or less qualified employees who are not members of the protected minority were promoted." Lee v. GTE Fla., Inc., 226 F.3d 1249, 1253 (11th Cir. 2000). Only factors two and four are disputed by the parties. UCF contends that Ren lacked the qualifications for the promotion to Full Professor and that there is no male individual who, under like circumstances, received promotion.

#### a. Qualifications

Whether Ren was qualified for a promotion is intertwined with the issue of whether her

7

promotion denial was pretextual and thus will not be examined at the prima facie stage. See Holifield v. Reno, 115 F.3d 1555, 1562 n.3 (11th Cir. 1997) (passing on qualification prong in discriminatory discharge context); Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1124 n.4 (7th Cir. 1994) (same); Weldon v. Kraft, Inc., 896 F.2d 793, 798-99 (3rd Cir. 1990) (same). The question is especially unnecessary in this case given that Ren fails to identify a similarly situated individual.[3]

### b. Similarly Situated Individual

Ren argues that Dr. Morgan Wang ("Wang"), a male faculty member in the statistics department, is a proper comparator because Wang applied for Full Professor at the same time and possessed research in the same field (statistics), yet Wang received Full Professor while Ren did not. "In order to meet the comparability requirement a plaintiff is required to show that he is similarly situated in all relevant aspects to the non-minority employee." Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001).

UCF argues that the mathematics department, a Ph.D.-granting department, cannot be

---

[3] For the benefit of the parties, it is worth mentioning that UCF's Promotion and Tenure Guidelines ("the Guidelines") are unclear on the specific qualifications necessary for promotion. The Guidelines state that the standards for promotion

> call for distinction in scholarship or teaching with substantial accomplishments in service or other university duties. Substantial contributions of a continuing nature in each of the areas, beyond that expected of an associate professor, are necessary components for the achievement of the rank of professor. (Def.'s Ex. L at 4.)

Both parties interpret the Guidelines in opposite, yet reasonable, ways. UCF argues that Ren fell especially short in the teaching qualification, and that the Guidelines require "substantial contributions of a continuing nature *in each* of the areas." Ren ignores the teaching element, arguing that she achieved distinction in research, and that the Guidelines merely call for distinction in "scholarship *or* teaching." Thus, beyond the fact that scholarship, teaching, and service are all elements used to evaluate candidates, the Guidelines do not assist this Court in determining whether distinction in one element or a combination of the three are required for promotion.

8

compared to the statistics department, a master's-granting department, because Ph.D. departments use a higher standard to evaluate its candidates seeking Full Professor. In support of this point, UCF relies on the testimony of four individuals:

(1) Tucker, the Chair of the UPTC, stated that doctoral programs have "much more emphasis on research" and on the teaching element, specifically "dissertation supervision and mentoring of doctoral students." (Tucker Dep. at 86, 188-89.)

(2) Richardson, the Chair of the MDPTC, testified that the mathematics department uses a higher standard than the statistics department, specifically with respect to research requirements. (Richardson Dep. at 60-61)

(3) Provost Whitehouse stated that the mathematics department uses a higher standard because it is a Ph.D.-granting institution. (Whitehouse Dep. at 274, 393-94).

(4) John Hitt, the UCF President, explained that "[s]tandards of scholarship would obviously be higher in a doctoral department than they would in one offering only bachelor's or master's degree, because the resources available to faculty members typically differ by that level." (Hitt Dep. at 28.)

In response, Ren attempts to provide evidence showing that the statistics and mathematics departments had the same promotion standards. Ren first submits the October 6, 2003 evaluation of Lorrie Hoffman, a statistics associate professor who applied for promotion to Full Professor. In the evaluation, the Chair of the Statistics Department recommended against Hoffman's application to Full Professor and explained that Hoffman failed to meet the research expectations. The Chair stated that the department was making "moves . . . to become a Ph.D. granting unit" and that research is the "decisive element in the process of promotion."

9

(Pl.'s Ex. L.) Ren argues that because the Chair referred to the statistics department's transition to Ph.D. status, the statistics and mathematics department must share the same standard of review. Ren's argument fails. There is nothing in the Hoffman evaluation showing that a department transitioning to Ph.D. status takes on the *same* standard as that of an actual Ph.D. department. Moreover, even if a transitioning department receives the same heightened scrutiny, Hoffman's evaluation is dated more than a year after Ren applied for Full Professor.[4] Ren fails to point the Court to evidence of the transition taking place at the time of Ren's application. On the contrary, Provost Whitehouse stated that the statistics department was not intended to be a Ph.D.-granting department. (Whitehouse Dep. at 106.)

Ren also offers the deposition of Greenwood, the Chair of the CAPTC, who stated that he was unaware of a different standard between the mathematics and statistics departments. (Greenwood Dep. at 76.) Again, Ren's evidence falls short. The fact that Greenwood was *unaware* of the different standards between Ph.D.-granting and non-Ph.D.-granting departments does not contradict the four testimonies stating that it was proper for mathematics department candidates to be reviewed under a heightened standard. Greenwood's testimony does no more than show that one member of a seventeen member panel, which was the third tier of a seven tier evaluation process, was unaware of a different standard.

In addition to Ren's failure to show a similar standard between the departments, Ren makes no showing that she and Wang shared the same supervisor or evaluators. Because Ren and Wang held positions in different departments, the first (held by members of the

---

[4] Ren applied for Full Professor on September 1, 2002. (Pl.'s Ex. A1 at 7.) Hoffman's evaluation is dated October 6, 2003. (Pl.'s Ex. L.)

10

mathematics department) and second (held by Ren's supervisor, Nashed) tiers of the evaluation process were presumably different. Thus, in the final analysis, Ren and Wang appear to share very little. They held positions in different departments, had different supervisors, were reviewed, at least in part, by different evaluators, and at least four members of the evaluation process—including the two ultimate decisionmakers—reviewed Ren under a heightened standard. See Malladi v. Brown, 987 F. Supp. 893, 909 (M.D. Ala. 1997) ("'[T]o be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'") (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)). Other courts have found these differences to be dispositive in the university tenure context. See Lim v. Trustees of Ind. Univ., 297 F.3d 575, 581 (7th Cir. 2002) (finding that comparators were not similarly situated when examined for tenure by a different supervisor and under more stringent standards); cf. Morrow v. Auburn Univ. at Montgomery, 973 F. Supp. 1392, 1406-07 (M.D. Ala. 1997) (finding that plaintiff had established a similarly situated comparator when both faculty members were from the same department and sought tenure in accordance with the same procedures). It is Ren's burden to show that she and Wang are similarly situated,[5] including the fact that they shared a substantially similar standard of review. Ren fails to carry this burden.[6] Ren, therefore, fails to

---

[5] Burdine, 450 U.S. at 252-53.

[6] Even when considered in the aggregate of the evidence, the nine points of circumstantial evidence alleged against Nashed as detailed in Part I, *supra*, fail to establish a prima facie case. See Jones v. Bessemer Carroway Med. Ctr., 151 F.3d 1321, 1322-23 (11th Cir. 1998) (assuming, but not deciding, that a plaintiff might be able to establish a prima facie case of discriminatory discipline, even if she could not show that a similarly situated employee was treated differently, if other circumstantial evidence of

establish a prima facie case by a preponderance of the evidence.

### 2. Ren Fails to Show that UCF's Non-Discriminatory Reason was Pretextual

Even if Ren had established a prima facie case, she fails to show that UCF's non-discriminatory reasons for not promoting Ren were pretext for an underlying gender discriminatory animus. In its motion, UCF submits Provost Whitehouse's reasons for denying Ren's promotion. Whitehouse stated that he had reservations about Ren's research and service experience, and had "serious doubts" about her teaching qualifications. (Whitehouse Dep. at 122.) More specifically, White detailed the following concerns about Ren's application: (1) a three year gap existed where Ren failed to publish (Id. at 123-24); (2) not enough time had passed to determine whether Ren's service achievements would continue at UCF (Id. at 125-26); (3) Ren had only advised one Ph.D. candidate (Id. at 130-31, 135); (4) Ren received relatively low scores on student evaluations compared to other candidates applying for Full Professor (Id. at 135); (5) Ren had not taught a graduate-level course in the mathematics department (Id. at 135-36); and (6) the timing of Ren's application was too early. (Id. at 135, 178.) The Court finds the above six reasons to be legitimate, non-discriminatory reasons. See

---

discrimination, such as discriminatory remarks, were present). Nashed's remarks and actions towards Ren that include the meeting, the email, and the dinner conversation remark, "to women, family is more important," fall short of inferring that Nashed's negative recommendation was based on discriminatory animus. See Jones, 151 F.3d at 1322-23 (finding that the three remarks "You black girls make me sick, sometimes I feel like just hitting you in the head"; "You black girls get away with everything"; and "You black girls make me sick," were not associated with the events leading to plaintiffs discharge, and holding that the remarks were not enough to establish a prima facie case; that is, the statements did not infer that it was more likely than not that plaintiff's termination was based on an illegal discriminatory criterion). While Young's separate complaint and Zhao's perceptions add to the circumstantial evidence, it is Nashed's actual actions toward Ren and whether those actions motivated his negative recommendation that are at the heart of the analysis. The Court must conclude that the evidence against Nashed falls short of inferring discriminatory animus and that even if sufficient, there is no hint of Nashed's taint on the seven-tiered promotional process.

Cooper v. S. Co., 390 F.3d 695, 725 (11th Cir. 2004) ("[T]he defendant's burden of rebuttal is exceedingly light . . . . At this stage of the inquiry, the defendant need not persuade the court that its proffered reasons are legitimate; the defendant's burden is merely one of production, not proof.") (alterations in original) (internal quotations and citations omitted).

In an attempt to show pretext, Ren argues that Provost Whitehouse's deposition, which attests to serious concern over Ren's teaching qualifications, is inconsistent with Defendant's Interrogatory Answer No. 8 (Pl.'s Ex. E) and the UCF Position Statement to the Florida Commission on Human Relations ("Position Statement") (Pl.'s Ex. D), which allegedly fail to suggest problems with Ren's teaching and solely take issue with her research record.

To establish pretext, Ren must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Cooper, 390 F.3d at 725 (citation and internal quotation omitted). Ren fails to establish pretext. The fact that the Position Statement includes Whitehouse's concerns regarding research but not teaching may establish that the Position Statement is incomplete, but this does not render Whitehouse's deposition inconsistent. Ren ignores the fact that Whitehouse expressed concern about Ren's teaching qualifications from the beginning—at the time of his review of the application. Whitehouse kept a provost summary page that detailed his thoughts from reviewing Ren's file and conducting her interview. With respect to the file, the notes express concern over Ren's "limited Ph.D. advising." Regarding the interview, Whitehouse writes "[t]ry to improve Calculus teaching." (Def.'s Ex. U.) Further, contrary to what Ren would have the Court believe, UCF's Answer to Interrogatory No. 8 explicitly identifies Whitehouse's concern over

13

Ren's teaching evaluations.[7]

More importantly, Ren fails to address UCF's proffered reasons head-on. See Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) ("Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."). Ren exerts little or no effort in showing how each of the aforementioned six reasons are dishonest or unworthy of credence. For example, Ren does not address the reasonable concerns of limited Ph.D. advising, the lack of graduate-level teaching in mathematics, the comparatively low student evaluation scores, or that a promotion was simply too early in Ren's case, given that she had only been at UCF for approximately one year.

Finally, Ren does not offer one hint of gender discriminatory animus with respect to Provost Whitehouse or President Hitt, the UCF decisionmakers. The nine points of circumstantial evidence directed at Nashed fail to infer that his negative recommendation was more likely than not based on discriminatory animus.[8] Even assuming that the evidence was sufficient to support an inference of discrimination with respect to Nashed's recommendation, there is no evidence of Nashed's taint or influence that could impute discriminatory intent to the UCF decisionmakers. The Eleventh Circuit has clearly held that "[w]here a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee." Pennington v. City of Huntsville, 261 F.3d 1262, 1270 (11th Cir. 2001) (affirming the district court's grant of summary judgment); see also Wright v.

---

[7] The last sentence of the interrogatory answer states: "Provost Whitehouse also hoped that Plaintiff's teaching evaluation would also show improvement." (Pl.'s Ex. E.)

[8] See *supra*, note 6.

14

Southland Corp., 187 F.3d 1287, 1304 n.20 (11th Cir. 1999) (finding that plaintiff failed to show that biased employee "manipulated" the final decisionmaker); Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir.1998) (finding that there was no "causal link" between decisionmaker's employment decision and a subordinate's discriminatory animus); Willis v. Marion County Auditor's Office, 118 F.3d 542, 547 (7th Cir. 1997) ("[W]hen the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissive basis, the bias of the subordinate is not relevant.").

The evidence in the record supports that Whitehouse conducted an independent review. Whitehouse stated that Nashed's evaluation was "one of many factors" that he took into account and that Nashed's reasons, as stated in the evaluation, were consistent with Ren's resume. (Whitehouse Dep. at 234, 146.) Further, Whitehouse explained that while he looked at Nashed's evaluation, he looked "more carefully for [his] own information." (Id. at 234.) This is apparent by Whitehouse's reservation concerning service and his three serious doubts with respect to teaching that are absent from Nashed's evaluation. The CASPTC[9] and Dean Seidel[10] also expressed teaching concerns that cannot be attributed to Nashed. The Court must conclude, therefore, that Ren presents no genuine issue of fact as to the truth of UCF's proffered reason to deny Ren's application. UCF is accordingly entitled to summary judgment with respect to Ren's Title VII and FCRA gender discrimination claims.

### C. Retaliation

---

[9] See Def.'s Ex. O at 3.

[10] See Def.'s Ex. Q.

Ren also brings a retaliation claim under Title VII and FCRA. Retaliation is a separate offense under Title VII; an employee need not prove discrimination for the retaliation claim to succeed. Sullivan v. Nat'l R.R. Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999). Title VII and the FCRA contain anti-retaliation provisions that make it unlawful for an employer to retaliate against any individual because he "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).[11] Because Plaintiff exclusively relies on circumstantial evidence of retaliatory intent, the claim is again analyzed under the McDonnell/Burdine three-part, burden-shifting analysis.[12]

### 1. Ren Fails to Establish a Prima Facie Case or Pretext

To establish a prima facie retaliation claim under Title VII, a "plaintiff must show (1) that she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) that there is some causal relation between the two events." Cooper, 390 F.3d at 740 (internal quotation and citation omitted).

Ren contends that UCF retaliated against her after she made multiple allegations of

---

[11] Section 760.10(7) of the FCRA mirrors Title VII. The statute states that it is unlawful for the employer "to discriminate against any person because that person has opposed any practice which *is* an unlawful employment practice under this section, or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section." Fla. Stat. ch. 760.10(7)(2003).

[12] Federal case law interpreting Title VII is applicable to retaliation cases arising under the FCRA. "Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII." Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387, 1389-90 (11th Cir. 1998); see also Fla. State Univ. v. Sondel, 685 So.2d 923 (Fla. 1st DCA 1996).

16

gender discrimination to Dean Seidel between October 18, 2002 and early 2003. Ren's allegations of discrimination to Dean Seidel constitute statutorily protected expression. 42 U.S.C. § 2000e-3(a); Rollins v. State of Fla. Dept. of Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1989) (stating that the filing of formal complaints and voicing concerns about discrimination to superiors constitute statutorily protected expression.); Holifield v. Reno, 115 F.3d 1555, 1566 (11th Cir. 1997).

The Court now turns to the question of adverse employment actions. Ren claims that she suffered retaliation in the following three ways: (1) Whitehouse denied her promotion; (2) Nashed gave her negative performance reviews; and (3) Nashed refused to honor Ren's teaching preferences. To prove an adverse employment action, the employee must show "a *serious and material* change in the terms, conditions, and privileges of employment. . . . as viewed by a reasonable person in the circumstances." Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001). The Court finds that the claims of retaliation with respect to Nashed fail to constitute adverse employment actions.[13] Ren's promotion denial, on the other

---

[13] With respect to Nashed's decision to schedule Ren with a reduced case load, Ren makes no showing that Nashed's action caused a tangible, negative effect on her employment. Nashed scheduled Ren with the reduced teaching load after Nashed requested to teach only on Monday and Wednesday afternoons due to the need to care for a baby at home. (Nashed Dep. at 333; Ren Dep. 404-05.) Rather than showing that her employment suffered a tangible, negative effect from the reduced teaching load, Ren relies only on a conclusory allegation, stating that Nashed's action "could only have been intended to have a negative impact on [Ren], and thus constitutes an adverse employment action." (Doc. 29 at 19.) This is plainly insufficient. An employee must show "a *serious and material* change in terms, conditions, or privileges of employment." Davis, 245 F.3d at 1239.

Likewise, Ren fails to adequately show how Nashed's issuance of two negative performance reviews caused her employment to change in a tangible way. From the outset, Ren's argument is weak because she fails to submit Nashed's actual reviews; instead, she only submits her prior reviews (Doc. 29 at 19; Pl.'s Ex.s Q, R.) In any event, Ren appears to have received an "outstanding" review in 2002-2003 and an "above satisfactory" review in 2003-2004. (Pl.'s Ex. T.) The Court fails to see how these reviews are negative. See, e.g., Lawrence v. Wal-Mart Stores, Inc., 236 F. Supp. 2d 1314, 1332 (M.D. Fla. 2002) ("A review of 'meets expectations' is hardly a poor evaluation."). Even if the evaluations could be considered negative as viewed by a reasonable person in the circumstances, Ren fails to show how the reviews were undeserved. Finally, it is unclear how Ren's salary will be affected, if at all. At deposition, Ren admitted that her salary had not been affected by the evaluations, but that she may receive a

hand, is clearly an adverse employment action. Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001).

To establish a causal relation between Ren's complaint of gender discrimination and UCF's decision to deny her promotion, Ren need only demonstrate that the two events "were not *wholly unrelated.*" Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999) (internal quotation and citation omitted). "[A] plaintiff satisfies [the causal relation] element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." Farley, 197 F.3d at 1337. Ren argues that causal relation is shown by the close proximity in time between Whitehouse's learning of Ren's discrimination complaint and Whitehouse's decision to deny her promotion. Ren's argument fails. Ren makes no showing of the actual time that Whitehouse first became aware of Ren's complaint, leaving this Court without the ability to determine whether a close proximity existed. (See Doc. 29 at 20.) Finally, even if Ren had established a prima facie case, Ren fails to establish that UCF's reasons for denying her promotion were pretext for an underlying retaliatory animus for the

---

lower merit pay raise depending on how the UCF administration decides to distribute the merit pay. (Ren Dep. at 412.) Ren submits UCF's salary increase notification (Pl.'s Ex. T) without explanation and the document, by the Court's reading, does not decisively show that Nashed's two evaluations lowered Ren's evaluations in a material way. The Court, therefore, must conclude that Ren fails to show an adverse employment action. See Davis, 245 F.3d at 1242 ("Given that Congress in § 2000e-2(a) has expressly limited the types of employer actions which may give rise to a Title VII discrimination claim, such a claim rarely may be predicated merely on employer's allegedly unfounded criticism of an employee's job performance, where that criticism has no tangible impact on the terms, conditions, or privileges of employment. An employee who receives criticism or a negative evaluation may lose self-esteem and conceivably may suffer a loss of prestige in the eyes of others who come to be aware of the evaluation. But the protections of Title VII simply do not extend to everything that makes an employee unhappy.") (internal quotations and citations omitted); see also Collins v. Miami-Dade County, 361 F. Supp. 2d 1362, 1370-71 (S.D. Fla. 2005) (finding that employer's negative evaluation failed to constitute an adverse employment action without a clear showing of a tangible and negative affect); McDaniel v. Fulton County Sch. Dist., 233 F. Supp. 2d 1386 (N.D. Ga. 2002) (same).

same reasons discussed in Part II(B)(2), *supra*.

### D. *Florida Educational Equity Act*

Ren brings her final count of discrimination under the Florida Educational Equity Act ("FEEA"), which makes it unlawful to discriminate "on the basis of race, ethnicity, national origin, gender, disability, or marital status against a student or an employee in the state system of public K-20 education." Fla. Stat. ch. 1000.05(2)(a)(2003). Florida litigants often couple the FEEA claim with a Title IX claim because both statutes share the purpose of prohibiting gender discrimination in public education. Landow v. Sch. Bd. of Brevard County, 132 F. Supp. 2d 958, 958, 961 (M.D. Fla. 2000); Daniels v. Sch. Bd. of Brevard County, 985 F. Supp. 1458, 1460 (M.D. Fla. 1997). It is well established that "for employment discrimination cases, the Title VII standards for proving discriminatory treatment should apply to claims arising under Title IX." Brine v. Univ. of Iowa, 90 F.3d 271, 276 (8th Cir. 1996) (internal quotation and citation omitted); Shuford v. Ala. State Bd. of Educ., 968 F. Supp. 1486, 1503-04 (M.D. Ala. 1997); Saville v. Houston County Healthcare Auth., 852 F. Supp. 1512, 1521 (M.D. Ala. 1994). Because the Title VII analysis applies to claims arising under Title IX, which is particularly similar to the FEEA, it follows that the Title VII analysis is equally applicable to the FEEA. Additional support for this conclusion comes from the Florida Supreme Court, which has stated that the FEEA prohibits sexual discrimination "using language modeled after Title VII." Byrd v. Richardson-Greenshields Sec., Inc., 552 So.2d 1099, 1103 (Fla. 1989). Ren's FEEA claim is accordingly dismissed.

AO 72A
(Rev.8/82)

## III. CONCLUSION

Defendant University of Central Florida Board of Trustees' motion for summary judgment (Doc. 21) is accordingly **GRANTED**. All other pending motions are **DENIED** as moot. The Clerk of the Court is directed to **ENTER JUDGMENT** on behalf of Defendant University of Central Florida Board of Trustees and **CLOSE THE CASE**.

**DONE** and **ORDERED** in Orlando, Florida on this 5 day of July, 2005.

_____
G. KENDALL SHARP
SENIOR UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record